81 F.3d 168
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
LABORERS HEALTH AND WELFARE TRUST FUND FOR NORTHERN
CALIFORNIA, et al., Plaintiffs-Appellees,
v.
FISHER DEVELOPMENT, INC., Defendant-Appellant.
 No. 94-15596.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 13, 1995.
Decided April 1, 1996.
 
 1
 Before: WIGGINS and LEAVY, Circuit Judges and REAL*, District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Fisher Development, Inc. appeals from a summary judgment in a trust fund collection action which resulted from the conduct of parties to a collective bargaining agreement. We reverse and remand.
 
 
 4
 Fisher Development, Inc. ("Fisher") is a nationwide general contractor and project manager that engages various subcontractors, union and non-union. The Northern California District Council of Laborers ("District Council") is a voluntary, unincorporated association, comprised of affiliated local unions and is the Collective Bargaining Representative for the Union with regard to negotiation and other aspects of the Laborers' Master Agreement ("Master Agreement"). The Master Agreement is between the Associated General Contractors of California, Inc. and the District Council who are affiliated with the Laborers' International Union of North America, AFL-CIO.
 
 
 5
 Fisher first entered into memorandum agreements, and so became a signatory employer, with the District Council on June 16, 1980. It is pursuant to the memorandum agreements that signatory employers make contributions to the Laborers Health and Welfare Trust Fund for Northern California ("Laborers") and abide by all the terms of the Trust Agreements. The purpose of the Trust Agreement is to provide for the establishment of such Trust Fund and for the maintenance of such Health and Welfare Plan in accordance with the terms of Collective Bargaining Agreements. The Trust Agreements allow the Board of Trustees to go to court to demand payment due to delinquencies without being limited or restricted by any grievance or arbitration procedures provided for in a Collective Bargaining Agreement.
 
 
 6
 The Laborers are not parties to either the memorandum agreement or the Master Agreement but stand in the position of a third-party beneficiary of the collective bargaining agreement and as such brought this action to recover delinquent trust fund contributions.
 
 
 7
 The Laborers brought their action to the district court under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132 et seq., specifically 29 U.S.C. § 1145, Delinquent Contributions which states: "Every employer who is obligated to make contributions to a multi-employer plan under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."
 
 
 8
 Fisher appeals the district court's summary judgment for Laborers which requires Fisher to submit to an audit for the period between July 1, 1989 and June 30, 1993, and to pay Laborers any delinquent trust fund contributions.
 
 BACKGROUND
 
 9
 On January 13, 1989, the District Council sent out the following to all signatory employers including Fisher:
 
 OFFICIAL NOTICE
 
 10
 "We are pleased to advise you that the Northern California District Council of Laborers has negotiated an Agreement which contains amendments, modifications, extensions and renewals of the Laborers' Master Agreement through June 30, 1993.
 
 
 11
 No Employer is authorized to accept these benefits or these concessions unless there is full acceptance of the entire Agreement.
 
 
 12
 If you do not return the signed Memorandum Agreement or otherwise respond by the close of business by February 15, 1989, your company will be bound by all amendments, modifications, extensions and renewals."[1]
 
 
 13
 Fisher understood the plain language of the District Council's 'OFFICIAL NOTICE' to be a "mid-term renegotiation, of the existing Master Agreement, that as drafted, included a 'new window period to terminate' as one of its terms." Fisher responded, within the newly created time frame, by writing the following which was sent to, and received by, the District Council on February 14, 1989:
 
 
 14
 "Pursuant to Section 29 of the 1986-1989 Laborers' Master Agreement made as of March 5, 1986, and your Official Notice dated January 13, 1989; Fisher Development, Inc. hereby gives notice that it wishes to terminate said Agreement upon its expiration of June 30, 1989."[2]
 
 
 15
 The District Council contends that its' January 13, 1989 'OFFICIAL NOTICE' was sent out for the purpose of notifying signatory employers that a new contract had been negotiated and to ascertain which employers would be taking advantage of that agreement. Mr. Archie Thomas, the District Council's Business Manager, states in his declaration: "The January 13, 1989 letter was in no way intended to reopen the 1986-89 contract, which by its terms, forbids reopening for any purpose. The January 13, 1989 letter was merely an attempt to allow signatory contractors to take advantage of the new contract before its June 30, 1989 effective date." (Emphasis added)
 
 
 16
 Section 32 of the 1986-89 Master Agreement provided for "Effective and Termination Dates" as follows:
 
 
 17
 "This agreement shall be effective as of the 15th day of April, 1986 and remain in effect without reopening for any purpose until the 30th day of June, 1989 and shall continue from year to year thereafter, unless either of the Collective Bargaining Representatives shall give written notice to the other of a desire to change the wages, hours and working conditions hereof not more than ninety (90) and not less than sixty (60) days prior to June 30 of any succeeding year.
 
 
 18
 The parties to this Agreement recognize the necessity of assuring the competitive position of the parties within the industry during the term of this Agreement. Consistent with that recognition, the parties will continually monitor the effectiveness of this Agreement relative to specific geographic or market area and will endeavor, by mutual agreement, to initiate such modifications to the Agreement during its term as may be necessary to assure the work opportunities of the employee and the competitive position of the individual Employers.
 
 
 19
 It is agreed that in the event either party should exercise its rights under the paragraph first set out, (the one above), they will for a period of sixty (60) days prior to the 30th day of June, 1989 or June 30th of any succeeding year bargain with each other with respect to all wage rates, working conditions and hours of employment of the work herein covered.
 
 
 20
 Should an impasse be reached during the course of future negotiations to amend and/or extend the present Agreement, or during the course of negotiations over a new agreement, either party may submit the items in dispute to the Dispute Settlement Board established in the AGC-Basic Trades Joint Labor Management Committee Impasse Settlement Plan for resolution. The findings of the Dispute Settlement Board shall be binding on the parties." (emphasis added).
 
 
 21
 The District Council did not respond to Fisher's letter of termination for three and one-half months. The District Council notified Fisher on May 26, 1989, that it's 'OFFICIAL NOTICE' was not a mid-term renegotiation and that it was going to continue to hold Fisher Development, Inc. bound by the termination terms of the 1986-89 Agreement. The window period to terminate under 1986-89 Master Agreement had been the month of April, 1989.
 
 
 22
 Fisher denied receiving the May 26th letter and offered the following evidence that the contract with the District Council had been timely terminated. It is undisputed that in March, 1990, at a San Francisco Fisher jobsite, Local 261 of the Laborers Union picketed Fisher but no grievance against Fisher was filed. On March 14, 1990, Fisher filed a complaint against Laborers with the National Labor Relations Board alleging that Laborers had picketed a construction site with the object of forcing employers to cease doing business with Fisher. Fisher contends that the picketing and the absence of a grievance reinforce the reasonableness of its belief that the Laborers considered Fisher non-union.
 
 DISCUSSION
 
 23
 A third party beneficiary's rights are generally subject to any contract defense which the promisor could assert against the promisee if the promisee were suing on the contract. However, Congress and the courts have acted to simplify trust fund collection actions by restricting the availability of contract defenses so traditional contract law does not apply with full force in actions brought under Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132 et seq. to collect delinquent trust fund contributions. This Court has held that an employer could raise fraud in the execution, but not fraud in the inducement, as a defense to its obligation to contribute to the trust fund. Rephrased, under 29 U.S.C. § 1145, the United States Court of Appeals for the Ninth Circuit has held that an employer may only raise contract defenses that render the collective bargaining agreement void rather than voidable. Southwest Administrators, Inc. v. Rozay's Transfer, 791 F.2d 769, 773-775 (9th Cir.1986) cert. denied 479 U.S. 1065 (1987). In Southwest Administrators, the employer's after-the-fact attempt to extricate itself through unilateral action from trust fund obligations that it knowingly accepted by arguing that there was no "meeting of the minds" was found by this Court to be little more than a restatement of the fraudulent inducement defense and so not permitted.
 
 
 24
 Here, Laborers claim that whether or not there was a midterm modification by the Union was irrelevant because a midterm modification, like a termination, is a defense to the contract, after formation, and therefore barred under the reasoning of Carpenters Health and Welfare Trust Fund for California v. Bla-Delco Construction, Inc., 8 F.3d 1365 (9th Cir.1993). The district court agreed that as a matter of law Fisher was not allowed to raise the purported termination of the contract as a defense against Laborers. The district court believed that the contract termination defense was barred under Bla-Delco and held that Fisher could not raise the fact that the underlying contract had been terminated, discharging Fishers' obligation to pay money into the Trusts. Yet, for an employer to be obligated to make employee benefit contributions to a trust fund, there must exist a binding collective bargaining agreement. Carpenters Southern California Administrative Corp. v. Russell, 726 F.2d 1410, 1413 (9th Cir.1984) However, the district court, apparently relying primarily on Bla-Delco, never went into whether or not there was a valid contract between Fisher and the District Council that would mandate Fisher to pay monies into the Trusts.
 
 
 25
 Topically, Bla-Delco appears to be similar to the current case. Employee trust funds sued an employer to recover delinquent contributions. The employer had attempted to terminate the collective bargaining agreement by sending a letter to the District Council. The argument in Bla-Delco centered on whether Bla-Delco effectively terminated the Master Agreement. The employer argued that it had terminated its memorandum agreement with the union that gave rise to its obligation to make contributions. The trust funds contested the timeliness of the notice of the termination, and argued that the agreement remained in effect.
 
 
 26
 However, Bla-Delco is distinguishable from Fisher. Unlike Bla-Delco, Fisher was responding to an 'OFFICIAL NOTICE' sent out by the District Council that in essence reopened the 1986-89 Master Agreement because it changed the 'effective date' of the newly negotiated Master Agreement and allowed signatory employers who choose to accept the 'new' Master Agreement, to immediately avail themselves of "amendments, modifications, extensions ... benefits and concessions" months prior to the June 30, 1989 effective date of the 1989-93 Master Agreement.
 
 
 27
 Logically, the 'OFFICIAL NOTICE' sentence, "If you do not return the signed Memorandum Agreement or otherwise respond by the close of business by February 15, 1989, your company will be bound by all amendments, modifications, extensions and RENEWALS" also changed the 'termination period' for signatory employers. The 'OFFICIAL NOTICE' provided directives that needed to be followed if a signatory employer chose not to be bound by the renewals. Fisher did not want to be bound by renewal. Fisher timely followed the directives provided on February 14th. Fisher stated it wished to terminate the Agreement upon its expiration of June 30, 1989. There must be a way for a signatory to terminate involvement with a Master Agreement.
 
 
 28
 In the 1993, Bla-Delco case, this Court held that an employer was precluded from raising contract termination as a defense to a trust funds' claim for recovery of delinquent employee benefit contributions where the collective bargaining agreement was not void, but merely voidable. Yet, as discussed, the fact that there may not be any contract at all to obligate an employer to pay is a different thing altogether. This Court's intention was not to preclude evidence that there was no valid contract between parties that would give rise to an obligation for an employer to pay into the trust funds as required by a master agreement.
 
 
 29
 This Court stated in Sheet Metal Workers' v. West Coast Sheet Metal, 954 F.2d 1506 (9th Cir.1992), that a contract to contribute to a trust fund of a union with which there is no ongoing collective bargaining relationship makes no sense. This Court stated that the provisions of a contract that concern trust fund contributions must be interpreted in the context of the contract as a whole and dismissed as arbitrary the argument that the only defense to a trust fund's collection action is illegality or that the collective bargaining agreement was void ab initio.
 
 
 30
 In Sheet Metal, as in Fisher, defendants did not knowingly accept an obligation to continue to contribute to the Trust Funds. Nor did it "after-the-fact" attempt to extricate itself from any existing obligation to the Union Trust Fund. Both defendants properly assumed that no such obligation existed after it affirmatively took steps to terminate the Agreements. In Sheet Metal it was after the Union's decertification. In the case before this Court, Fisher purposefully refused the Master Agreement renewal the District Council's 'OFFICIAL NOTICE' created. If the District council did not intend its' 'OFFICIAL NOTICE' to modify the period that a signatory could terminate, then the District Council should have responded to Fisher's February 14th termination letter before the end of April 1989, while the Section 32 termination period of the 1986-89 Master Agreement permitted Fisher to terminate.[3]
 
 
 31
 This Court explained in Sheet Metal that legal obligations have their source either in authority acting within its proper jurisdiction or in a contract properly executed and currently effective. In Sheet Metal, this Court found that neither source existed. Now in Fisher, we find that neither source exists to hold Fisher to the 1989-93 Master Agreement. Fisher's lack of a contract with the District Council, makes contributions to Laborers' Trust Fund void not voidable.
 
 
 32
 This same conclusion was reached in Alaska Trowel. When a contract was found to be void, there would simply be no legal obligation to make further contributions. Alaska Trowel Trades Pension Fund v. Lopshire, 855 F.Supp. 1082 (D.Alaska 1994). The Court in Alaska Trowel stated that to read Bla-Delco in the manner in which trust funds would suggest, would vitiate an employer's legal right to terminate a collective bargaining agreement. The district court felt that proposition was neither supported by law nor common sense.
 
 CONCLUSION
 
 33
 All the issues on appeal arise from the District Court's refusal to consider the plain language of the 'OFFICIAL NOTICE' sent out by the District Council on January 13, 1989. Fisher's argument that the plain meaning of the 'OFFICIAL NOTICE' viewed in the light of applicable Ninth Circuit precedent, compel a conclusion that the new window period to terminate had been met has merit. Fisher complied with the terms of the 'OFFICIAL NOTICE' in a timely manner. If the District Council was not attempting to create a new window of termination, then it had an affirmative duty to make it known in time for any signatory to avail itself of the window of termination period under Section 32 of the 1986-89 Master Agreement.
 
 
 34
 While traditional contract laws are not a defense to enforcement under 29 U.S.C. § 1132 et seq., ERISA, this is analogous to a situation where the defense of a void contract is permissible. Fisher Development, Inc. did not have a valid contract with Laborers that would have given rise to an obligation to pay monies into Laborers' Trust Funds. Laborers contentions that Fisher should have attempted to arbitrate the dispute regarding termination of the collective bargaining agreement with Laborers makes little sense. Fisher met the February 15, 1989 deadline of the Master Agreement as amended, and so was no longer bound by the agreement. Arbitration is a matter of contract and a party cannot be required to submit to arbitrate any dispute which it has not agreed so to submit.
 
 
 35
 Accordingly, the district court ruling is reversed and the case remanded with instructions to enter summary judgment for Fisher Development, Inc.
 
 
 
 *
 Hon. Manuel L. Real, United States District Judge for the Central District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by the Ninth circuit
 
 
 [1]
 Fisher specifically requested the Ninth Circuit Court of Appeals to take note of the words that "if the signators did not respond by close of business on February 15, 1989, THEY WOULD BE BOUND BY RENEWAL."
 
 
 [2]
 Section 29 of the 1986-89 Master Agreement is the General Saving Clause which basically addresses the issue of the parties not to enter into any Agreement that could be found to be illegal or void as in being in contravention of any law, ruling or regulation. The only sentence that may have some applicability to Fishers intent. "The parties agree that if and when any provisions of this Agreement are finally held or determined to be illegal or void, they will then promptly enter into lawful negotiations concerning the substance thereof."
 
 
 [3]
 In Bla-Delco, the Union responded back to Bla-Delco 's letter of termination in less than three weeks which allowed one additional week's time for Bla-Delco to take advantage of the window of termination in the existing Master Agreement. Here, in Fisher, the District Council's three and one-half months procrastination, or manipulation, should not be rewarded. If the District Council had responded to Fisher's February 14, letter of termination before the end of April, 1989, Fisher, in an abundance of caution, could have sent a second letter of termination