SOUTHERN CALIFORNIA PAINTERS & ALLIED TRADE DISTRICT COUNCIL NO. 36, Plaintiff–Appellant,

v.

BEST INTERIORS, INC., Defendant–Appellee.

No. 02–55028.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 2003.

Filed Feb. 25, 2004.

Anthony R. Segall (argued) and Ricardo Ochoa (briefed), Rothner, Segall & Greenstone, Pasadena, CA, for the plaintiff-appellant.

Ronald W. Novotny, Hill, Farrer & Burrill, Los Angeles, CA, for the defendant-appellee.

Before: PREGERSON, REINHARDT, and ARCHER,* Circuit Judges.

* The Honorable Glenn L. Archer, Jr., Senior Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

PREGERSON, Circuit Judge:

Appellant Southern California Painters & Allied Trades, District Council No. 36 ("Union" or "Painter's Union"), brought an action for breach of contract. In due course, Best Interiors, Inc. ("Best") brought a motion for summary judgment against the Union. The district court granted Best's motion and entered summary judgment against the Union. We reverse.

## FACTS

Appellant Union is a labor organization that represents employees with respect to the terms and conditions of their employment. Appellee Best is an employer in the drywall industry. The Union has been a party to an industry-wide collective bargaining agreement with a multi-employer association, the Western Wall & Ceiling Contractors Association ("WWCCA"). Best is a member of the WWCCA. The agreement covers drywall finishers in Los Angeles, Orange, and San Diego Counties.

From April 1999 to September 2000, Best and the Painter's Union were signatories to the industry-wide agreement known as the 1998–2000 Southern California Drywall Finishers Joint Agreement ("1998–2000 Joint Agreement"). Pursuant to the 1998–2000 Joint Agreement, the Union represented Best's drywall finishers. Best was also signatory to a labor agreement with another union, the Southern California Conference of Carpenters ("Carpenter's Union") covering Best's drywall "hanger" and "framer" employees. The contract between Best and the Carpenter's Union provided that the Carpenter's Union would also cover Best's drywall finishers if Best was not a signatory

to a labor agreement with the Painter's Union.

On May 19, 2000, Best informed the Painter's Union that it would cease to be a party to the 1998–2000 Joint Agreement on that agreement's expiration date, September 30, 2000. The WWCCA meanwhile negotiated another industry-wide agreement covering drywall finishers, the 2000–2003 Southern California Drywall Finishers Joint Agreement ("2000–2003 Joint Agreement").

After the 1998–2000 Joint Agreement expired, Best voluntarily increased the wages and benefits levels paid to its drywall finishers to the level of the newly negotiated 2000–2003 Joint Agreement. Best also informed the Union it wanted to negotiate some modifications to the terms of the 2000–2003 Joint Agreement for San Diego County. The Union and Best met on three occasions to negotiate the modifications.

On October 19, 2000, the first day of negotiations between Best and the Union, Best proposed a reduction in benefits and a reduction in the wage rates for apprentices in San Diego County. Best also informed the Union that it was thinking of signing an agreement with the Carpenter's Union to represent its drywall finishers. Following the meeting, on November 1, 2000, Union representative Jim Dunleavy faxed Steve Foran, Best's president, a proposal for reducing the apprenticeship rates in San Diego County. Foran agreed to the Union's proposed wage rates. Ultimately, on February 8, 2001, the union faxed Best a Memorandum of Understanding ("MOU") regarding the San Diego apprenticeship rates. The Union informed Best that it could implement the new rates on the next payroll period.

During the Union's and Best's second negotiating session on January 19, 2001, Best asked the Union about the availability of "job targeting assistance," i.e. funds that the Union could contribute for selected jobs in order to reduce Best's costs on those jobs. The Union responded that job targeting assistance was already available through an "Industry Advancement Fund" of the Labor Management Cooperation Committee ("LMCC"). The Union suggested that Best talk to the LMCC about access to the fund.

On February 13, 2001, the parties met for their final negotiation session. Best again raised the issue of job targeting assistance. The Union again informed Best that the issue of job targeting assistance should be addressed to the LMCC. During the negotiating session, the Union agreed to reduce its benefits package in San Diego to a level comparable to that of the benefits package offered by the Carpenter's Union. In addition, Best accepted the Union's proposal for an entry level rate of $18 per hour.

At the end of the negotiation session, Grant Mitchell, the Union's business manager, indicated orally to Best that the Union felt the parties had reached an agreement on the San Diego modifications. Foran requested that Mitchell reduce the agreement to writing. Mitchell agreed to send Best's representatives a revised MOU for their signature. Foran apparently said something like: "Okay, we got there, great." The parties shook hands and left. During the meeting, neither party referred to the agreement Mitchell was to reduce to writing as a proposal. No representative of Best indicated a need or desire to review the terms of the MOU before being bound.

That same day, the Union faxed Best a copy of the MOU. The MOU stated that Best and the Painter's Union "hereby mutually agree" to amend the 2000–2003 Joint Agreement in the manner provided. The next day, February 14, Best faxed the MOU back to the Union, requesting that it

make minor typographical changes. The Union made the changes, and the Union faxed and mailed the revised MOU the same day.

On February 15, Union representatives stopped by Best's offices in San Diego and spoke with Steve Foran. According to the Union, Foran informed the Union that the MOU was on the desk of Best Vice President Dennis Ayres awaiting his signature.

Best never signed the MOU. Instead, unbeknownst to the Union, on February 19, 2001, Best met with the Carpenter's Union and came to an agreement providing that the Carpenter's Union would represent Best's drywall finishers. On March 1, 2001, Best sent the Union a letter stating it was "repudiating the ... collective bargaining agreement with your organization." Best informed the Union that the Carpenter's Union would now represent Best's drywall finishers.

On March 15, 2001, the Union filed the present action against Best for breach of contract and declaratory relief. The Union argued that Best adopted the 2000–2003 Joint Agreement by implementing its terms, and that it assented to the MOU in the February 13, 2000 meeting. In response, Best filed a motion for summary judgment. On November 28, 2001, the district court granted Best's motion for summary judgment. The district court held (1) that Best did not adopt the 2000–2003 Joint Agreement because it did not agree to the provision orally or in writing, and (2) that Best's compliance with the terms of the Joint Agreement did not establish its acceptance of the agreement. The district court also concluded that there was no triable issue regarding whether Best assented to the MOU.

## STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment. *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir.2002).

Viewing the evidence in the light most favorable to the non-moving party, our task is to determine whether there are any genuine issues of material fact for this case to go to trial and whether the district court correctly applied the relevant substantive law. We do not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir.1999) (en banc). In contract formation cases, "summary judgment is inappropriate where ... there is a question as to whether there was a mutual intent to contract." *Webster University v. United States*, 20 Cl.Ct. 429, 434 (1990), citing 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure 2d* § 2730.1 at 265 (1983).

## DISCUSSION

The Union argues that the district court's grant of summary judgment was improper because there exists a genuine issue of material fact as to whether Best adopted the 2000–2003 Joint Agreement. Specifically, the Union contends that under *E.S.P. Concrete Pumping, Inc.*, 327 NLRB 711, 1999 WL 105294 (1999), Best adopted the contract by implementing the new wage and benefit provisions in the 2000–2003 Joint Agreement without any legal obligation to do so. Best does not dispute that it implemented the new terms of the Joint Agreement, but instead counters that our decision in *O'Connor v. Carpenters*, 702 F.2d 824 (9th Cir.1983), forbids us from concluding that Best adopted the Joint Agreement. Best further argues that the Union's adoption theory is also factually untenable as evidenced by Best's continued negotiations with the Carpenter's Union. We find that triable issues of fact exist as to whether Best adopted the 2000–2003 Joint Agreement and assented to the February 13 MOU. Therefore, we

reverse the district court's grant of summary judgment in favor of Best.

## I.

The first major issue is whether Best, by its conduct, adopted the 2000–2003 Joint Agreement. It is undisputed that any collective bargaining agreement ("CBA") that may have been formed between Best and the Union is governed by 29 U.S.C. § 158(f). In *Hawaii Carpenters' Trust Funds v. Henry*, 906 F.2d 1349, 1355 (9th Cir.1990), we rejected the argument that an employer may adopt a § 158(f) contract by its conduct. Our holding in *Henry*, however, was based on deference to a National Labor Relations Board ("Board") decision that is no longer good law, *Garman Construction Co.*, 287 NLRB 88, 90 n. 5, 1987 WL 90128 (1987). In *Garman*, the Board held that the employer, Garman, did not violate the National Labor Relations Act by making unilateral changes in terms and conditions of employment following the expiration of a § 158(f) multiemployer CBA—even though Garman continued to comply with some of the terms of the prior CBA. The Board held that Garman was not bound to the new CBA because Garman withdrew from the multiemployer unit before the previous contract expired and did not negotiate a subsequent contract. *Garman Constr. Co.*, 287 NLRB at 88. The Board stated in a footnote that it did "not find th[e] adoption-by-conduct doctrine to be applicable in [§ 158(f) ] cases." *Id.* at 90 n. 5.

In 1999, the Board came to the opposite conclusion in *E.S.P. Concrete*, 327 NLRB 711. The Board observed that *Garman's* rejection of the adoption theory in § 158(f)

agreements was "mere dicta." 327 NLRB at 712. In *E.S.P. Concrete*, the Board considered whether E.S.P. Concrete, which took over a union business after the previous owner died, adopted the CBA between the union and E.S.P.'s previous owner. E.S.P. Concrete never signed the union contract. E.S.P. Concrete did, however, abide by the terms of the CBA and represented itself as a union contractor. Examining the legislative history and purpose of § 158(f), the Board concluded that the adoption-by-conduct doctrine was applicable to § 158(f) agreements even in the absence of a signed agreement. The Board concluded that E.S.P. Concrete had adopted the agreement because it complied with the terms of the previous CBA by deducting and remitting union dues from employees' pay, meeting with the union regarding labor disputes, and making payments to the union's pension and health and welfare funds. The Board held that the statement in *Garman* which rejected adoption-by-conduct in § 158(f) contracts was dicta because in that case, the employer expressly refused to bargain with the union, and the union did not allege that the employer adopted a successor agreement.[1]

Because our decision in *Henry* was based on our deference to the Board's decision in *Garman*, we are no longer bound by *Henry*. As this court stated in *Mesa Verde Construction Co. v. Northern California District Council of Laborers*, 861 F.2d 1124, 1134–35 (9th Cir.1988) (en banc): "if prior decisions of this court constitute only deferential review of NLRB interpretations of labor law, and do not decide that a particular interpretation of

1. The Board in E.S.P. recognized that the "Ninth Circuit has found the *Garman* dicta was a reasonable construction of Sec. [158(f) ]" but emphasized that this court's decision was "based on its deference to the Board's construction of the Act." *E.S.P. Concrete*, 327 N.L.R.B. at 712 n. 7. The Board

also underscored that "[f]or the reasons set forth in this decision, we find that applying the same principles used to determine whether a collective-bargaining agreement has been formed in 8(f) and 9(a) cases better reflects the policies of the Act." *Id.*

statute is the only reasonable interpretation ... subsequent panels of this court are free to adopt new and reasonable NLRB decisions without the requirement of en banc review." (internal citation omitted). The panel in *Henry* did not hold that the Board's purported rejection of adoption-by-conduct theory in § 158(f) contracts was the only reasonable interpretation of § 158(f). Instead, we examined whether we should defer to *Garman;* we asked whether the NLRB's decision in *Garman* was a "reasonable and tenable construction" of § 158(f). *Henry,* 906 F.2d at 1354 (citing *Mesa Verde Constr. Co.,* 861 F.2d at 1134). While we also examined the policy reasons underlying what we believed to be the Board's rejection of the adoption-by-conduct principles to § 158(f) contracts, we made clear that we "defer[red] to the Board's decision in *Garman* " to reject the applicability of adoption by conduct principles in § 158(f) cases. *Henry,* 906 F.2d at 1355.

On the other hand, we may depart from *E.S.P. Concrete* and "the Board's interpretations of the National Labor Relations Act only if they are not 'reasonably defensible.' " *NLRB v. Gen. Truck Drivers, Local No. 315,* 20 F.3d 1017, 1021 (9th Cir.1994) (quoting *NLRB v. United Union of Roofers, Local 81,* 915 F.2d 508, 510 (9th Cir.1990)). The Board presents compelling reasons to permit the adopt-by-conduct theory in § 158(f) contracts. Quoting the Supreme Court's decision in *Jim McNeff, Inc. v. Todd,* 461 U.S. 260, 271, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983), the Board reasoned: "it strains both logic and equity to argue that a party to such an agreement can reap its benefits and then avoid paying the bargained-for consideration." *E.S.P. Concrete,* 327 NLRB at 713. Furthermore, the Board observed that "[n]othing in the text or legislative history of Section [158(f) ] requires the Board to depart from its traditional principles of contract interpretation,

including the adoption by conduct doctrine." *Id.* Also, the Board examined the legislative history and purpose of § 158(f) and concluded that "adoption by conduct principles in [§ 158(f) ] cases effectuates the Congressional labor policies for the construction industry ...." *Id.; cf. Retlaw Broad. Co. v. NLRB,* 53 F.3d 1002, 1005 (9th Cir.1995) (noting our deference to the NLRB's interpretation of the National Labor Relations Act).

In light of the Board's considered judgment and reasoning, we decline to depart from the Board's rule in *E.S.P. Concrete* that employers who are party to § 158(f) agreements can adopt a contract by their conduct. Our holding that the Board's observations are at a minimum "reasonably defensible" is bolstered by our recognition of the validity of the adoption-by-conduct doctrine in other areas of contract law. *See, e.g., Bay Area Typographical Union v. Alameda Newspapers, Inc.,* 900 F.2d 197, 200 (9th Cir.1990). We thus conclude that the district court erred as a matter of law in dismissing the Union's case on the ground that § 158(f) does not permit parties to adopt a labor agreement by conduct.

We next turn to whether the Union has presented a triable issue of fact regarding whether Best adopted the 2000–2003 Joint Agreement. The Union argues that there is enough evidence to create a triable issue of fact as to whether Best adopted the 2000–2003 Joint Agreement by its conduct. The Union points to the fact that Best implemented the terms of the 2000–2003 Joint Agreement, instead of simply continuing with the terms of the 1998–2000 Joint Agreement. Further, as noted above, Best's contract with the Carpenter's Union provided that the Carpenter's Union would cover Best's drywall finishers if Best was not a signatory to a labor agreement with the Painter's Union; the Painter's Union contends that Best's

failure to apply the terms of the Carpenter's Union agreement indicates that Best adopted the 2000–2003 Joint Agreement.

Best counters that its ongoing negotiation regarding the MOU reflects that there is no evidence that Best ever complied with the terms of the 2000–2003 Joint Agreement. Best argues it was only maintaining the *status quo ante* pending the completion of negotiations. We reverse the district court, and hold that the Union presented sufficient evidence to survive summary judgment on whether Best adopted the 2000–2003 Joint Agreement by its conduct.

It is important to clarify that the Union argues that Best's conduct demonstrates that it adopted the 2000–2003 Joint Agreement, not the Memorandum of Understanding. The two documents are distinct contracts. Thus, as an initial matter, we find that Best's ongoing negotiations regarding the MOU are irrelevant to the issue whether Best is bound by the Joint Agreement.

■ To determine whether a party has adopted a contract by its conduct, the relevant inquiry is whether the party has displayed "conduct manifesting an intention to abide by the terms of the agreement." *NLRB v. Haberman Constr. Co.*, 641 F.2d 351, 356 (5th Cir.1981) (en banc). Best's conduct is similar to other employers' actions where the Board or a court has found that an employer adopted a contract by its conduct. In *E.S.P. Concrete*, for example, the Board held that E.S.P. Concrete adopted the previous CBA by its conduct because E.S.P. Concrete complied with the terms of the agreement by deducting and remitting dues, paying union wages and benefits, and representing itself as a union business. *See also Haberman Constr. Co.*, 641 F.2d at 356–57 (company adopted § 158(f) contract by paying workers at CBA payscale and contributing to the Union's trust funds); *Arco Elec. Co. v. NLRB*, 618 F.2d 698, 699–700 (10th Cir. 1980) (company adopted CBA during negotiations because it availed itself of the benefits of the union hiring hall for referral of employees, deducted union assessments and remitted them to the union, made appropriate deductions for various union funds, and paid its employees working under the contract the wage scale called for in the CBA). A trier of fact could similarly conclude that Best adopted the 2000–2003 Joint Agreement because it voluntarily implemented the new terms of the Agreement by applying them to its drywall finishers. Best even gave the workers a dollar per hour wage increase that was mandated under the new agreement. As the Board held in *E.S.P. Concrete*, it is not conclusive that Best did not sign the agreement. *See also Certified Corp. v. Hawaii Teamsters Local 996*, 597 F.2d 1269, 1272 (9th Cir.1979); *Scandia Stucco Co.*, 319 NLRB 850, 855 (1995).[2] A jury could conclude that, by its conduct, Best adopted the 2000–2003 Joint Agreement.

## II.

■ The Union further argues that the district court erred in holding that no tri-

---

2. *O'Connor v. Carpenters*, 702 F.2d 824 (9th Cir.1983), on which Best relies, does not require a contrary result. In that case, the court discussed whether an employer was bound to a subsequent labor agreement based on the doctrine of estoppel. The court held, among other things, that "[t]he Company by its conduct subsequent to the termination of the 1977–1980 agreement did not make manifest its intent to be bound by the subsequent agreement it never executed." *Id.* at 825. Not only does *O'Connor* not establish a per se rule regarding what conduct may be sufficient for adoption, *see id.* at 826 ("*Under the circumstances*, [the employer's actions] did not indicate a consent to be bound by the new agreement." (emphasis added)), *O'Connor* was decided before *E.S.P. Concrete*, the decision that provides the legal basis for the adoption-by-conduct theory we employ today.

able issue of fact existed whether the Union and Best reached an agreement on February 13, the terms of which were embodied in the February 13 Memorandum of Understanding. Specifically, the Union contends that a reasonable jury could find that Best expressed assent to the February 13 MOU as a legally binding oral agreement by its statements and conduct at the conclusion of the February 13 negotiation session. In addition, the Union argues that its sworn testimony provides evidence of its intention to be bound by an oral contract, even though the Union's actions may have indicated that it intended the agreement to be memorialized in writing. Best contends that it never expressed the requisite amount of assent to, or intent to, be bound to the February 13 MOU. Furthermore, Best argues that it never signed the agreement, as the terms of the MOU required. We agree with the Union, and hold that Best's actions create a triable issue of fact regarding whether it is bound by the February 13 MOU. We conclude that a similar triable issue exists regarding the Union.

"Whether or not the parties entered into an agreement is essentially a question of fact." *NLRB v. H. Koch & Sons*, 578 F.2d 1287, 1290 (9th Cir.1978). This court is "not prevented" from concluding that a party has manifested assent "because the parties manifest an intention to memorialize their already made agreement in writing." *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 313–14 (9th Cir.1996) (citing Restatement (Second) of Contracts § 27 (1981)). The determination of whether a party intended its oral agreement to become binding upon a writing or immediately effective "depends on the circumstances." *Id.* at 314.

■ We have long recognized that "general principles of contract law apply to the formation of collective bargaining agreements." *Operating Engineers Pension*

*Trust v. Cecil Backhoe Service, Inc.*, 795 F.2d 1501 (9th Cir.1986). Thus, "[o]bligations under a collective bargaining agreement, like those under contracts in general, rest ultimately on the principle of mutual assent." *Id.* We consider the full context of the agreement because the "surrounding circumstances and the intentions of the parties are relevant to determining if a binding agreement exists." *Id.*

The Union's sworn testimony that it intended to be bound by an oral agreement sufficiently establishes, for summary judgment purposes, the Union's intent to be bound. Under this court's decision in *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158–59 (9th Cir.1999), a district court may not discount sworn testimony regarding a party's intent simply because it contradicts earlier sworn statements. In *Leslie*, the plaintiff stated in a deposition and in a sworn declaration that the parties intended to be bound by an oral agreement. The defendant moved for summary judgment based on unsworn pre-litigation correspondence between the parties, where the plaintiff stated that "to be proper and in force the . . . contract must be on company letterhead and signed in ink." *Id.* at 1155. We reversed the district court's grant of summary judgment, observing that "[a]lthough we can understand the district court's disbelief of Leslie's assertions in his deposition and sworn declaration, such disbelief cannot support summary judgment." *Id.*

In this case, there is an open question as to whether the parties intended to require a written agreement on this issue. Union representative Mitchell testified under oath that the Union did not intend to be bound only upon the execution of a written agreement. Rather, Mitchell testified that the Union's motive in seeking a signed MOU was to memorialize the agreement it had reached with Best. Nevertheless, be-

cause the MOU contained the language "hereby mutually agree," the district court apparently disregarded this testimony. The district court wrote that the phrase "hereby mutually agree" "does not confirm that [Best and the Union] have already agreed, but states that, *by that document* (i.e., 'hereby'), they agree." Following *Leslie*, we hold that the district court erred by elevating the words of the MOU (which are in any event not inconsistent with the existence of an oral agreement) over the Union's sworn statement that it intended to be bound by the oral agreement reached at the February 13 negotiating session.

We next consider whether Best is bound by the oral agreement. In *Rennick*, this court held that a ceremonial gesture as minimal as a handshake at the conclusion of a bargaining session may be a basis for a jury to conclude that a contract was formed between two parties. *Rennick*, 77 F.3d at 315 ("a jury might reasonably infer either that the handshake was a confirmation of a contract, or that it was an expression of friendship and the absence of ill will after a hard day of bargaining"); *see also H. Koch & Sons*, 578 F.2d at 1289 (employer's statement of "swell" constituted its assent to contract following conclusion of discussion with union representative).

The Union presents more evidence than hand-shaking to support its case that Best manifested its assent to the contract. Best representatives apparently ended the February 13 negotiation session stating: "Okay, we got there, great." The tenor of the final negotiation was upbeat and light. After the meeting, Best requested that the union reduce the agreement to writing and send it to Best for its signature. The parties concluded the meeting and shook hands. After the Union memorialized the agreement, Best faxed the MOU back to the union with minor typographical changes and a handwritten request that the Union make the changes.

In addition, in the letter in which Best informed the Union that it was entering into a contract with the Carpenter's Union, Best expressly said it was "repudiating the above-referenced collective bargaining agreement." Best's statement that it was "repudiating" the "collective bargaining agreement" indicates that it felt that the parties had reached a final agreement. Based on those facts, we conclude that the Union presented a triable issue of fact as to whether Best assented to, and is bound by, the agreement the parties reached after its February 13 negotiation session.

## CONCLUSION

We thus REVERSE the district court's decision that summary judgment was appropriate on the issue of whether Best adopted the 2000–2003 Joint Agreement by its conduct, and REVERSE the district court's decision that summary judgment was appropriate on the issue of whether Best assented to the MOU on February 13, 2000.

**REVERSED AND REMANDED.**